AIPLE TOWING COMPANY, Inc., a corporation, and Upper Mississippi Towing Corporation, a corporation, Plaintiffs,

v.

CARGO CARRIERS, INC., a corporation in personam and the M/V JOHN H. MacMILLAN, JR., its engines, tackle, equipment, etc., in rem, Defendants.

No. 69 A 314(2).

United States District Court,
E. D. Missouri, E. D.

Oct. 12, 1971.

---

40.   V.A.T.S. Election Code, art. 13.08c note.

41.   V.A.T.S. Election Code, art. 13.08c note.

Goldstein & Price, St. Louis, Mo., Lord, Bissell & Brook, Chicago, Ill., for plaintiffs.

Lucas & Murphy, St. Louis, Mo., for defendants.

## MEMORANDUM AND ORDER

REGAN, District Judge.

By this action in admiralty, in personam against Cargo Carriers, Inc. and in rem against the Motor Vessel John H. MacMillan, Jr., Aiple Towing Company, Inc. and Upper Mississippi Towing Corporation seek to recover damages resulting from a casualty on the Mississippi River. A counterclaim seeks damages in personam against plaintiff Aiple Towing Company and in rem against its Motor Vessel Hiawatha.

Aiple Towing Company owned and operated the M/V Hiawatha, a diesel towboat with 2700 rated horsepower. The M/V John H. MacMillan, Jr., a diesel towboat with 7800 horsepower, was owned and operated by Cargo Carriers, Inc. In the early morning of April 22, 1968, the Hiawatha, piloted by Captain Joseph Edward Chamberlain, was proceeding downbound in the Mississippi River in a section of the river bordered by the states of Arkansas and Mississippi. It was pushing a tow of 12 loaded grain barges made up in 4 lateral tiers and 3 perpendicular strings. The tow was 780 feet long and 105 feet wide. At the same time the John H. MacMillan, Jr., piloted by Vincent F. Bruno, was upbound in the river, pushing a tow of 23 barges, 16 loaded and 7 empty, made up in 5 strings. Its tow was 975 feet long and 175 feet wide. The tow of the Hiawatha included barges CJ-1660 and MAT-91.

As the result of a radio call by Captain Bruno for downbound traffic, about 4 or 4:30 a.m., Bruno and Chamberlain agreed that their tows would pass below Scrubgrass Bend in a straight section of the river just above the mouth of Sibly Chute at about Mile 598. At the time of this agreement the Hiawatha was in the vicinity of Clay Wilson Light at about Mile 600 and the MacMillan was some 4 miles away in Victoria Bend at about Mile 596. It was agreed that the Mac-Millan would hold on the left descending side to permit the Hiawatha to pass on the right ascending side, effecting a port-to-port passage. Scrubgrass Bend is a narrow channel at Mile 599.1, at least a mile above the agreed passing point. In their radio conversation, Captain Chamberlain described his tow and informed Captain Bruno that he intended to "steer" the bend rather than "flank" it.

There was a swift current with a strong set to the Arkansas bank. To compensate for this set, Captain Chamberlain angled the head of his tow toward the center of the channel and steered the bend at between 10 and 12 miles per hour. As he so steered the bend, the head of his tow was about 600 feet from the Arkansas bank with the stern about 300 feet from the same bank. The navigable channel at that point is approximately 900 feet wide. As he came out of the bend, he proceeded at once to straighten out his tow, and it was entirely on the Arkansas side of the mid-channel line when the Hiawatha was approximately 1500 feet upstream from the tow of the MacMillan. Just about this time the MacMillan struck and grounded on a reef or sandbar about 700 feet from the Mississippi bank and two strings of barges broke loose. Observing this, and in an effort to avoid these barges, Captain Chamberlain pulled hard starboard almost hitting the Arkansas bank. One string of the barges passed safely on the port side of the Hiawatha. However, the head barge of the second string struck the forward barge of the Hiawatha tow at an angle of 35 to 40 degrees, damaging that barge (Barge IBL-31) and the barge immediately behind it (UM-113). Also damaged in the casualty were barges CJ-1660 and MAT-91 from the Mac-Millan.

In determining the factual issues and the respective liability of the parties, we note that the MacMillan had obviously agreed to hold up at least a mile below Scrubgrass Bend and that its captain had been advised, without objection on his part, that the Hiawatha would "steer" the bend. Thus, neither pilot considered the agreed passing point as a "narrow channel" for the purposes of passing, within the meaning of the Narrow Channel Rule (§ 91.11, 33 CFR). And since there was to be no passing in the admittedly narrow channel of Scrubgrass Bend or within a mile thereof, the speed of the Hiawatha in "steering" the bend rather than flanking it could not be, and in our judgment was not, negligence under the existing circumstances.

We also find from the credible evidence that the MacMillan did not in fact hold up at the agreed passing point at which the channel was wider but instead continued upriver past that point. It is beyond question that but for the MacMillan striking the reef or sandbar, the two vessels would have passed without incident. In our view, the pilot of the MacMillan was not sufficiently alert and it struck the sandbar in Captain Bruno's effort to avoid what he believed, but without reasonable justification, was a possible collision with the downbound Hiawatha. In steering Scrubgrass Bend there was a point at which the lights of the Hiawatha were at an angle, so that the Hiawatha appeared to Captain Bruno to be headed in his direction. However, this was only a momentary period during the course of the Hiawatha making its turn in the bend, as Captain Bruno (as an experienced pilot) should have

realized had he been sufficiently alert.[1] And immediately thereafter, the Hiawatha turned toward the Arkansas shore, and at all times after it left the bend, some 1500 feet upriver from the Mac-Millan, the Hiawatha was on the Arkansas side of the mid-channel line. A contributing factor to the grounding, for which the Hiawatha was not responsible, was the fact the buoys marking the channel were some 50 feet or more out of position. However, a pilot such as Captain Bruno should have realized that fact, instead of relying on the position of the buoys. And we also find that Captain Bruno failed to observe the fathometer before grounding his vessel on the reef.

■ Even if the agreed place of passing be considered a "narrow channel," we do not believe that anything set forth in the Narrow Channel Rule bespeaks negligence on the part of the Hiawatha, at least as a direct contributory factor. That rule by its terms has application when two steam vessels "are *about to enter* a narrow channel at the same time." In such situation, the Rule requires the ascending steam vessel to be stopped *below* the narrow channel until the descending steam vessel shall pass there. As noted supra, both pilots, who were well aware of this Rule, considered the agreed stopping place for the Mac-Millan to be "*below* such (narrow) channel."

The Rule further provides that should two steam vessels "*unavoidably* meet in such narrow channel" then among other things, the pilot of the descending vessel shall cause his vessel to be worked slowly until he has passed the ascending vessel. If, after having agreed to stop below the narrow channel, Captain Bruno continued upriver to a point where the river was narrower than the agreed meeting place, the meeting of the two vessels could not be deemed "unavoidable" from the point of view of Bruno, the pilot of the ascending vessel, but in any event there was no danger until such time as he negligently steered his vessel toward the Mississippi shore, striking the reef.

■ We find that Aiple Towing Company and the Hiawatha were not guilty of negligence contributing to the casualty. The Hiawatha did nothing which in our judgment caused the MacMillan to go aground. Captain Chamberlain was not bound to anticipate that the Mac-Millan would leave a place of safety and go aground. When the emergency situation arose, Captain Chamberlain acted in a reasonably prudent fashion. As appears supra, the collision resulted from the negligence of Cargo Carriers, Inc. and the MacMillan in failing to hold up as agreed, and in negligently causing the MacMillan to leave the channel without reasonable cause and without taking appropriate steps to determine the depth of the water prior to the accident, as should have been done in the exercise of good seamanship. Plaintiffs are entitled to recover.

The parties have stipulated that the damages sustained by plaintiffs are in the amount of $10,360.00 as to Aiple Towing Company, Inc. and $4,124.00 as to Upper Mississippi Towing Corporation.

The foregoing memorandum constitutes our findings of fact and conclusions of law. The Clerk is directed to enter judgment in favor of plaintiffs and against defendants Cargo Carriers, Inc. and the Motor Vessel John H. MacMillan, Jr. in the amounts to which plaintiffs respectively are entitled on plaintiffs' claims and in favor of plaintiff Aiple Towing Company, Inc. and the Motor Vessel Hiawatha and against defendant Cargo Carriers, Inc. on the counter-claim of Cargo Carriers, Inc.

1. We find from the credible evidence that Captain Bruno was engaged in conversation ("shooting the breeze") with a crew member while his vessel was proceeding upstream, so that his attention was distracted.